## BRYAN AND WIFE *vs.* WEEMS.

[BILL IN EQUITY FOR PARTITION OF SLAVES, ACCOUNT OF HIRE, &C.]

1. *Continuance of trustee's title.*—Where slaves are conveyed by deed to a trustee, his heirs, executors and administrators, in trust for the sole and separate use of a married woman during her life, " and after her death for the use, benefit and behoof of her children by her present husband, and their heirs forever," the title of the trustee does not cease at the death of the first taker.
2. *When statute of limitations commences to run against trustee.*—Where the separate property of the wife is allowed by her trustee to remain in the possession of her husband, who, at his death, disposes of it by his will ; and the trustee is cognizant of facts which are sufficient to charge him with implied notice of the general provisions of the will before it is admitted to probate,—the adverse possession of the husband's executor, as against the trustee, commences to run from the probate of the will and possession under it.
3. *When cestui que trust is barred in equity.*—The rule is well settled, that if the trustee delay the assertion of his rights until he is barred by the statute of limitations, the *cestui que trust* will also be barred.
4. *How statute affects children of female slave.*—When the statute has effected a bar against the recovery of a female slave, the bar is also complete as to

her children born after the commencement of the adverse possession. (RICE, C. J., *dissenting*, held that the bar as to the children was not complete until they were six years old, unless they were born after the completion of the bar as to their mother.)

APPEAL from the Chancery Court of Dallas.

Heard before the Hon. JAMES B. CLARK.

THE case made by the record may be thus stated: In December, 1831, Simmons Harrison, of the county of Jones in North Carolina, there executed a deed of gift, conveying certain slaves to one William H. Green, his heirs, executors and administrators, in trust for the sole and separate use, benefit and behoof of Mrs. Mary R. Bush, who was the daughter of said Harrison and the wife of Nathan B. Bush, during her life ; and after her death, for the use, benefit and behoof of her children by the said Nathan B. Bush, and their heirs forever. Soon after the execution of this deed, Bush and his wife removed to this State, and brought with them the slaves conveyed by the deed. Mrs. Bush died in 183 leaving three children, Holland, Mary and Penelope. The slaves remained in the possession of said Nathan B. Bush until his death, which happened in 1844, at which time he had acquired several others by his industry and economy, and by the services of the slaves conveyed by the deed. By his last will and testament, which was duly admitted to probate, and of which one Alexander Sledge was the executor, said Bush bequeathed all the slaves then in his possession, including those conveyed by the deed, with the increase of the females, to his three daughters, but not in equal portions—the bequest to Penelope being larger than the others. The executor proved the will, took possession of all the property, proceeded to a settlement of the estate, and delivered the slaves to the respective legatees. After the death of said Bush, his daughter Holland married Frederic B. Bryan; Mary married Thomas J. McQueen ; and Penelope, the youngest, married Samuel W. Weems. In August, 1850, Mrs. Weems died, having bequeathed all her property to her said husband, who afterwards proved her will, and took possession of all her slaves and other property.

In December, 1850, Mr. and Mrs. Bryan, with Mary Bush,

who was then unmarried, filed their bill against said Green, Weems, and Sledge; alleging their ignorance of the deed from Simmons Harrison until a short time previous to the filing of the bill; and asking that the said Sledge, as executor of Bush, might be made to account for the hire and services of the slaves during the life of his testator, and that the slaves might be divided between Mrs. Bryan and Mrs. McQueen.

The defendant Weems answered the bill, demurring for want of equity, and setting up the statute of limitations in defense of the suit. The answer also contains other matter, which is not deemed material.

On final hearing, the chancellor held the statute of limitations a bar to the relief sought, and therefore dismissed the bill; and his decree is now assigned as error.

WM. M. BYRD, for the appellants.—1. When the objects of a trust have been fully performed, the title of the trustee ceases, and the legal, as well as the equitable title, vests in the beneficial owner, unless it clearly appears to have been the grantor's intention that the legal title should continue in the trustee after the trust had been fully performed; and where the trust is created by deed, the courts are more cautious in restraining the trustee's title, that when it is created by will. Comby and Wife v. McMichael, 19 Ala. 747; Freeman v. Perry, 2 Dev. Eq. R. 243; Falls v. Torrence, 4 Hawks, 412.

2. The death of the negroes must be the loss of Weems, who wrongfully withholds them.—Goodman's Ex'rs v. Pledger's Adm'rs, 14 Ala. 120.

3. When the trustee has the mere legal title, his acts cannot affect the rights of the beneficiaries.—Smith v. Riddle, 15 Ala. 29.

4. In all cases where trustees ought to convey to the beneficial owner, it should be left to the jury to presume, if such presumption can reasonably be made, that they had conveyed accordingly.—1 Green. Ev. § 46; Doe v. Sybourn, 7 T. R. 2; Doe v. Staple, 2 T. R. 696. And so, in equity where the possession unites with the ultimate equitable title, and so remains for six years, the naked legal title of the trustee will be extinguished in favor of the beneficiaries.—Smith v. Ruddle,

28

15 Ala. 29; 4 Hawks, 412; Comby v. McMichæl, 19 Ala. 747; Couthway v. Berghaus, 25 Ala. 393; Hillary v. Waller, 12 Vesey, 252; 7 T. R. 49; 8 *ib*. 118; Langley v. Sneyd, 1 Sim. & Stu. 45–55; Carteret v. Carteret, 2 P. Wms. 134; Goodson v. Ellison, 3 Russ. 583; England v. Stade, 4 T. R. 683; Angier v. Stanard, 3 My. & K. 571; Wilson v. Allen, 1 J. & W. 611; Cook v. Sottan, 2 Sim. & Stu. 154; Hill on Trustees, 253–68.

A. R. MANNING, *contra*, made several points which are not decided by the court, and which are for that reason omitted; and further contended,—

1. That the complainants, before filing a bill for partition, should have established their title at law.—Phelps v. Green, 3 Johns. Ch. 302.

2. That the legal title of the trustee did not cease at the death of Mrs. Bush, but continued at least during the minority of her children; and that the cases cited to this point by the appellant's counsel, arose under deeds containing language different from that employed in Harrison's deed, and were therefore inapplicable.

3. That the trustee was informed that the property was held adversely to the deed, and was therefore barred by the statute of limitations; and his title being barred, the complainants are also barred.—Williams v. Otey, 8 Humph. 563; Colburn v. Broughton, 9 Ala. 362.

STONE, J.—We are fully satisfied with the views of the chancellor, and the result which he attains on all the points necessary to a decision of this case.

1. However the rule might be, if the trustee in this case were appointed by will, (Hill on Trustees, 239,) his estate and interest did not terminate with the life of Mrs. Bush. The deed of Simmons Harrison conveyed the property to the trustee, " his heirs, executors and administrators," * * * "in trust and for the following uses, interests and purposes—viz., in trust and for the separate and exclusive use and benefit of the said Mary R. Bush during her natural life, and in no wise or manner to be subject or liable to or for the contracts or debts of the said husband, Nathan B. Bush ; and after her death, for the use, benefit and behoof of the children of the

said Mary R. Bush by her present husband, the said Nathan B. Bush, and their heirs forever.". There are no words in this deed, indicating an intention that the estate in fee, which the deed creates in the trustee, shall be cut down into a less estate. The estate of the trustee continued after the death of both Mrs. and Mr. Bush.—Wykham v. Wykham, 18 Vesey, 395; Coleman v. Tindall. Y. & J. 605; Jones v. Strong, 6 Ired. 367 ; Murritt v. Wendley, 3 Dev. 399 ; Martin v. Prage, 4 B. Monroe, 524; Fry v. Smith, 2 Dana, 38.

Our own decisions are not in conflict with this. In Smith v. Ruddle, 15 Ala. 28, the deed directed that at the death of the said Elizabeth H., the property, both real and personal, was to go to and be equally divided between the children. Elizabeth H. was dead ; and of course the estate of the trustee was at an end.

In Comby v. McMichael, 19 Ala. 747, the deed directed the trustee to "convey the property to such of the issue" of the *cestui que trust*, as should be living *at her death*. Mrs. McMichael was dead ; and Ch. J. Dargan held, that the legal title of the trustee had determined, because the deed clearly contemplated that result.

Couthway v. Berghaus, 25 Ala. 393–406, simply decides, that a tender in that case to the *cestui que trust* was sufficient. The trustee lived out of the State, and was a mere naked trustee without interest. The *cestui que trust* had himself made the purchase of the property, taking the title in the name of his sister; while he, the beneficiary, was in possession of the property, receiving the rents and profits. The court rightly held, that the money was due to Berghaus, and that the tender to him was sufficient.

2. While Mr. Bush held the possession of the slaves, he must be regarded as holding in subordination to the title of the trustee. His declarations to Mr. Green, and to Mr. Whitfield, shortly before his death, would establish this proposition, if it needed confirmation. A short time before the death of Mr. Bush, he expressed to the trustee an inclination and wish to make a will, and to make more ample provision for Penelope, who afterwards married Mr. Weems; speaking of her as his "poor afflicted daughter." The testimony of Mr. Green, the trustee, who was examined as a

witness, satisfies us that he, Green, knew of the making of a will by Bush, and its "general character," before such will was admitted to probate. This was, at least, enough to put him on inquiry; and is equivalent to notice.—Smith v. Zurcher, 9 Ala. 208, and authorities cited. The bill, after stating that Mr. Bush executed his will and died in June, 1844, proceeds as follows: "Whereupon Alexander Sledge, the executor named in said will, caused the same to be duly admitted to probate in the orphans' court of said county; obtained letters testamentary upon said estate, from the same court; undertook the execution of said will, and possessed himself as such executor as aforesaid of all the slaves and other personal property mentioned therein." The will mentions all the slaves in controversy, except some children born since the probate, of females bequeathed by the will; a part of which children are with their mothers in the possession of each legatee. The answer admits these averments, but states that the executor possessed himself of the property before the will was probated. These several facts constituted the executor an adverse holder, from and after the probate of the will, and possession of the property under it by him. From that time the statute commenced running against Green, the trustee.—Findley v. Patterson, 2 B. Monroe, 76; Den, *ex dem.*, v. Shanklin, 4 Dev. & Bat. Law, 289.

3. Between the time of the probate of the will of Mr. Bush, and the commencement of this suit, more than six years elapsed. The trustee was then barred of his action of detinue. The rule is certainly well settled, that if a trustee delay the assertion of his rights until the statute perfects a bar against him, the *cestui que trust* will also be barred.—Colburn v. Broughton, 9 Ala. 351–363; Hovenden v. Lord Annesley, 2 Sch. & Lef. 628–9; Angell on Limitation, 514, § 6; Bond v. Hopkins, 1 Sch. & Lef. 429; Freeman v. Perry, 2 Dev. Eq. 243; Couch v. Couch, 9 B. Monroe, 160; Falls v. Torrence, 4 Hawks' Law & Eq. 412.

4. It will be seen that we have assimilated the complainant's right to relief in this case to the trustee's right to maintain detinue. If, at the time the bill in this case was filed, Green, the trustee, had instituted his action of detinue or trover for

Bryan and Wife v. Weems.

the slaves, against Sledge, the executor, the six years statute, if pleaded, would have barred either action, not only as to the slaves bequeathed by the will, but also as to the offspring of the females, born after the adverse holding. Morris v. Perregay, 7 Gratt. 373; White v. Martin, 1 Porter, 215. When defendant's right to property is established by a successful interposition of the plea of the statute of limita-tions, it relates back to the time of the first taking, and carries with it all the intermediate profits, and the increase of the females while in the adverse possession of such defend-ant, unless, as to such increase, some act be done before the bar against recovery of the mother is perfected, which prevents the operation of this rule. *Partus sequitur ventrem.* To hold otherwise, would lead to strange results in the case of female slaves. An adverse holding of six years would vest the title in the holder. During the time she was adversely held, she may, at intervals, have given birth to children; she and the children all the time remaining together, out of the possession of the claimant. She may have given birth to an infant within a very short time before the comple-tion of the six years. According to the argument, all claim to the mother would be forfeited, while to bar the right to recover her child would require another period of near six years.

Another illustration may serve to present this argument in a stronger light. Suppose the property adversely held consist of domestic animals, who multiply at an early age, and rapidly. Before the six years expire, the females, in all probability, will have increased abundantly; and perhaps at no point of coming time, will there be a female that has reached the age of six years, without yielding her increase. If the offspring do not follow the mother as an incident, but each successive scion must itself be adversely held for the term of six years before the statute runs, unless, before its birth, the parent stock had existed and been adversely held for a like period, the entire interest of the former owner would not probably be extinguished in any conceivable num-ber of years. This point was not raised in argument; but we have felt it our duty to notice it, as the court is not unanimous.

The claim for hire, and for profits of the labor of the slaves, while in the possession of Mr. Bush, is barred both by lapse of time, and by the statute of non-claim.

Under these principles, the right of complainants is barred. Whether Mr. Bush, or those claiming under him, can set up fraud in the original deed to Mr. Harrison, and from him to Mr. Green in trust, we need not inquire.—See Walton v. Bonham, 24 Ala. 513 ; Twine's case, 3 Rep. 83 ; Roberts on Conveyances, 10–11.

The decree of the chancellor is affirmed.

RICE, C. J.—There are many cases, in which the true owner of property, by *electing* a particular form of action, and prosecuting it to judgment and satisfaction, or by electing to sue for only part of an entire demand, has been held to have *waived* and lost his right to that full measure of redress to which he would otherwise have been entitled. Thus, if a female slave has been permanently converted, and the owner *elects* to bring trover for such conversion, and recovers her value, and receives satisfaction, he thereby *elects* to treat the conversion as *a purchase* by the person guilty of the conversion; and as soon as the judgment is satisfied, the title to the slave passes, by operation of law, to the defendant in the judgment, and *relates back* to the time of the conversion. Consequently, the children born of such slave *after the conversion*, and pending the suit for the conversion, become the property of the defendant in the suit, as soon as the owner of their mother accepts satisfaction of the judgment therein rendered. That result is worked out by the application of the doctrines of *election, waiver*, and *relation.*—See White v. Martin, 1 Porter, 215; Firemen's Ins. Co. v. Cochran, 27 Ala. R. 228; Wittick v. Traun, *ib.* 562.

But those doctrines have no application to the present case; for the complainants have not *brought any former suit*, nor *done any act* which can be construed into an *election* or *a waiver*, or which can enable the defendant to invoke the doctrine of *relation.* They have been *merely passive*; and if they have lost their right to any of the slaves in controversy, it is *by mere force* of that part of the statute of limitations, which requires the owner of personal chattels adversely held to sue

for them *within six years* after the commencement of the
adverse possession.

The legal effect of that part of that statute, is not, in my
opinion, what my brethren have pronounced it to be in the
opinion just delivered. They hold, that it bars the complain-
ants as to slaves who were not six years old when this suit
was commenced, and who had not been held adversely for six
years, and who were born of a mother who had not been held
adversely for six years at the time of their birth. I cannot
assent to that position.

Where slavery exists, the children of a female slave belong
to him who, at the time of their birth, was the general and
absolute owner of their mother. The children born of her
whilst she is in the possession of an adverse holder, *but before
the adverse holding has continued six years,* are as completely
the property of the person who, at the time of their birth, is
the absolute owner of their mother, as if they had been born
whilst she was in the actual possession of that absolute owner.
The children born of her *after the adverse holder has, by an
adverse possession of six years,* acquired *the title to her,* belong
to the adverse holder. The statute of limitations has no
effect whatever upon the title of the true owner to the mother,
until she has been in the adverse possession of another for the
full period of six years. *So far as that statute is concerned,*
her children, as soon as they are born, are, in legal contempla-
tion, as separate and distinct from her, as if in fact they were
not in any wise related to her. Each child, as soon as born,
is a personal chattel, separate and distinct from its mother,
and from every other child. The detention of each child
born *before the mother has been adversely held for six years,* is a
new, separate, and distinct cause of action, which the true
owner may enforce in a separate and distinct suit.—Wittick
v. Traun, *supra.* The cause of action for the detention of a
child could not possibly accrue before it was born. The statute
of limitations does not commence running against a cause of
action before it accrues. One separate and distinct cause of
action is not barred by that statute, merely because another,
which accrued at a different time, is barred. That stat-
ute does not give to the adverse possessor title to a
slave which has neither been held adversely for six years,

nor been born of a mother who had been held adversely for six years before its birth. In other words, to give title to a slave to an adverse possessor, under the statute of limitations, it is at least essential that the slave should have been held adversely for six years, or should have been born of one who had been held adversely for six years prior to its birth. If a child is born before its mother has been held adversely for six years, it is legally impossible that the true owner can be barred as to the child, by the mere operation of the statute of limitations of six years, before the child is six years old. According to the opinion of my brethren, that statute may bar the owner, as to the child, before the child is three days old! They work out this strange result, by what seems to me a very plain misapplication of the doctrine of *relation*, and by overlooking the effect of the undeniable proposition, that the detention of each child born, *before the mother has been held adversely for six years*, is in itself a cause of action, *new, distinct, and different* from that which arose from the detention of the mother.—Ivey v. Owens, 28 Ala. Rep. 641.

One illustration will be sufficient to demonstrate the unfitness of the application of the doctrine of relation to any case like the present: Suppose A. has held adversely, for four years, the female slave of B. At the end of the four years, and whilst adversely held, she gives birth to a child. When the child is one year old, B., the real owner of the mother and child, finds the child in the highway, takes it peaceably into his possession, and keeps it until after the six years adverse possession of its mother has run out, and the title to her has thereby become vested in the adverse possessor. The adverse possessor, as soon as he has thus acquired title to the mother, brings detinue for the child against the owner who had taken the child in the highway as aforesaid! He invokes the doctrine of *relation*, and calls upon the court to apply the doctrine, and give him a judgment for the child.— Would any court, upon such facts, think of applying the doctrine of *relation*, or giving to the adverse possessor a judgment for the child? If my brethren are right in their opinion, the adverse possessor would recover the child, upon the doctrine of *relation*. His title to *the mother* being clear, by adverse possession of *six years*, and the child having been born whilst

his adverse possession was continuing, although it had continued only four years at the birth of the child,—the law, as laid down by my brethren, would give him the child, by making his title to the mother *relate back* to the commencement of the adverse possession.

Without saying anything as to other parts of the opinion of my brethren, I here record my dissent from the reasoning and conclusions attained by them.