## ETTING and others *v.* MARX's EXECUTOR.

*(Circuit Court, E. D. Virginia.* June, 1880.)

1. EQUITY — STATUTE OF LIMITATIONS — CONCURRENT JURISDICTION.—A court of equity is only bound to apply the statute of limitations where its jurisdiction is concurrent with that of a court of law.

2. SAME — SAME — EXCLUSIVE JURISDICTION.—A court of equity generally acts in analogy to the statute of limitations, but is not bound by it, where its jurisdiction is exclusive of that of a court of law.

3. SAME—SAME — LACHES. — A court of equity, however, does not act in analogy to the statute of limitations where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights.

4. SAME—SAME—TRUSTEE AND CESTUI QUE TRUST.—It is a general rule that, as between a trustee and his *cestui que trust,* neither the statute of limitations, nor the rule of analogy, nor lapse of time will, in general, affect the right of the beneficiary to redress; yet equity will in such cases, when the circumstances require it, enforce against the *cesti que trust,* especially where the rights of third persons are concerned, its own peculiar maxim, *vigilantibus et non dormientibus jura subserviunt.*

5. SAME—SAME—SAME.—Among such exceptional cases are (1) those in which the public convenience requires that there shall be a speedy end of strife; (2) those in which some of the principal parties, in transactions sought to be reviewed, are dead and their vouchers lost; (3) those in which the court could not be certain, from lapse of time, that relief, apparently proper, would certainly be just; and (4) those in which the disturbance of purchasers or transactions acquiesced in for a greater or less time would prejudice the vested rights of third persons.

6. SAME—SAME—SAME—ACQUIESCENCE.—*Held,* under the circumstances of this case, that an acquiescence for 12 years in an investment of a trust fund in confederate bonds would prevent the *cestuis que trust* from recovering the scaled value of the confederate money with which such bonds were purchased, at the expense of the subsequent creditors of the trustee.

7. TRUSTEE AND CESTUI QUE TRUST—COVERTURE.—*Held, further,* that such *cestuis que trust* were not barred from suing the trustee by coverture, or by being otherwise not *sui juris.*

In Chancery.

Samuel Marx, of Richmond, Virginia, died in the fall of 1860, leaving a large estate, consisting in part of real estate,

but chiefly of valuable stocks and bonds. He left a will appointing his brother Dr. Frederick Marx, his nephew Edward Mayo, both of Richmond, and another who never qualified, his executors, and also trustees for the trusts created by his will; and devised to Frederick Marx, and certain of his adult nephews, certain portions of his estate in absolute right, and to his executors the residue thereof; but charged them as trustees, as to these portions, with certain trusts in favor respectively of Judith Meyers, Harriet M. Etting, Caroline Barton, and Adeline Mayo, his married sisters then living; and of certain daughters of his deceased sisters Louisa Myers and Frances Etting. He directed all his real estate and personalty to be sold as soon as possible after his death, and those proportions of the proceeds which were not devised absolutely to be invested in good and secure stocks, with power in the trustees to convert them into other stocks, the securities to be taken in the names of the executors for the beneficiaries named in the will, and to show on their face for whose benefit they were respectively to be held; and provided that these securities should have the character of realty in the event of the death of those entitled.

Frederick Marx was the only one of those named as executors who qualified shortly after the death of Samuel Marx, which he did on the thirteenth December, 1860. He seems to have filed an appraisement of the estate in due time, according to law, and to have accounted regularly, before a proper commissioner, as to his transactions for the years ending December 13, 1861; December 13, 1862; December 13, 1863; and for the subsequent period ending September 7, 1864. I believe that it is admitted that he made the sales and investments required by the will in good faith; no fraud being charged or pretended in regard to any of his transactions.

On November 26, 1864, up to which time Frederick Marx had acted as sole executor and trustee, he turned over to Edward Mayo, who had then just qualified as executor and trustee, all the stocks, bonds, funds, and estate in his hands,

taking minute and detailed vouchers and receipts from him; and from the time of doing so he does not seem to have had any actual connection with the estate or the trusts of the will, either in the capacity of executor or trustee; and this fact seems to have been well known to complainant and petitioner. The subsequent accounts of Edward Mayo, made up by commissioners of court, show that Frederick Marx had turned over the estate in the manner just stated to Edward Mayo.

The disconnection of Frederick Marx from the estate at the date named seems to be acknowledged by the bill and recognized by the decree in a friendly suit which was instituted in the circuit court of Richmond in March, 1869, entitled *Etting et al.* v. *Marx et al.;* the object of which was to substitute as trustee for Mrs. Etting, then under coverture, Francis M. Etting, one of her adult sons, in the place of Edward Mayo. It is not pretended that Frederick Marx acted or was considered as acting in the capacity of executor or trustee, after November 26, 1864, whatever his legal relation to the trust might have been. The bill in the friendly suit just named recites that the powers of Frederick Marx had been revoked after he had "acted for a time." The transactions of Frederick Marx in the years 1861, 1862, and 1863, in the securities of the estate, were very large, aggregating probably $75,000. After 1861 they consisted of sales of stocks for confederate money, and in the exchange of one sort of bonds for another, and of stocks in the name of Samuel Marx for those in the name of the executor for the respective beneficiaries of the trusts of the will.

These transactions are not brought in question in the present litigation; but in the year 1864, or chiefly in that year, Frederick Marx bought, with confederate money received for other stocks, a large amount of the bonds of the confederate government. The securities of every name which Frederick Marx held as the result of his transactions under the will were, as before stated, all turned over on November 26, 1864, by him to Edward Mayo, and Edward Mayo has duly turned over all of them except the confederate bonds to the persons entitled. The confederate bonds, however, were refused by some of the

beneficiaries; and the object of the present litigation is to recover of the representative of Frederick Marx the scaled value of the confederate money he received in 1864, or chiefly in that year, and which he expended in the purchase of the confederate bonds which have been refused by some of the beneficiaries of the will of Samuel Marx. The suit was brought by Harriet M. Etting, who became *sui juris* on the death of her husband in 1870. It was brought in February, 1877, and those of the other beneficiaries who have been disposed to join in the litigation have come in by petition. The controversy is chiefly in regard to the confederate bonds. A smaller matter, also in controversy, is that presented by the petition of Moses Myers, for whom Frederick Marx made a deposit of $3,004 in the Bank of Virginia at Richmond on May 6, 1863, Myers being then in the federal lines, and not having notice of the deposit at the time, nor at any time before April, 1865, when it became worthless by the insolvency of the bank.

Frederick Marx was married in 1874, and died in the beginning of 1877, shortly before the filing of Mrs. Etting's bill. He left debts to the amount of $5,200, contracted, I believe, within a few years before his death; none of which could be paid if the claims of the complainant and petitioners in this litigation were sustained by the court.

Harriet M. Etting became *sui juris*, as before stated, in 1870. In March, 1869, during her coverture, her son, Frank M. Etting, who was then an adult, was substituted, on her own prayer, for Edward Mayo, as her trustee, by decree of the circuit court of Richmond, as before mentioned. Very soon after the appointment of Frank M. Etting as such trustee all the securities which Edward Mayo held for Mrs. Etting, which had been turned over by Frederick Marx in November, 1864, were turned over to Etting by Mayo, and were all received, except the confederate bonds.

In a letter of June 18, 1869, occupied almost exclusively with statements and inquiries about the stocks and bonds which had been forwarded to him by Mayo, Frank M. Etting wrote to Edward Mayo, on one point, as follows:

"I must here take occasion to say that we have heard, accidentally, that Uncle Frederick had been told (in some unfortunate discussion with a member of the family) that it was our intention to take legal steps against *him* in consequence of some of his investments. Such statement *was utterly without* foundation. Mother's remark on hearing of it was that there were but few of the family left, and she would never consent to such a course for 50 times the amount. I join most entirely in the feeling, and I beg you will assure Uncle Frederick of this. However unfortunate the results have been, no one of our family has ever ascribed to him any action inconsistent with his near relationship, or his character as an honorable man; nor has any remark been made in my presence but what might well be repeated in his. I regret it should be necessary for me to give such assurances; but this is not the first time that an effort has been made to create differences in the family—always bad enough, but tenfold worse if arising from mere pecuniary considerations. Aside from any claim of any kind, and with no intention of action in the matter, I still (to be perfectly frank with you) cannot feel justified in my own eyes in receipting for certificates of confederate stock. I do not want to embarrass your settlement in any way, or delay it, and we will see what can be done as soon as I have more time."

In a letter of kinship dated July 3, 1869, Frank M. Etting wrote, among other things, to Edward Mayo as follows: "I transmit herewith a receipt, etc.; also return what I am not entitled to give a receipt for. The money so invested has gone, but I think all can say, let it go." He alluded to the confederate bonds.

*John A. Coke* and *W. W. Henry,* for complainants.

*John S. Wise,* for defendant.

HUGHES, D. J. There is little to be considered in this case, except the liability of the estate of Frederick Marx for the scaled value of the confederate money, which, in 1864, or chiefly in that year, he invested in confederate bonds. No one disputes that these bonds were an illegal object of invest-

ment. All investments in them have been irrevocably decided to be void, as having been made "in aid of the rebellion."

It is not charged, however, that there was, on the part of the deceased trustee, any fraudulent motive or intention, moral or political, in making the investments. There is no element or charge of fraud, actual or constructive, in the present case; and so the only question is one of liability for a well-intended but illegal act. Nor can it be denied that the estate is liable for these investments, unless it has been absolved by the bar of the *statutes of limitations,* or by the *laches* of the complainant and petitioners in this suit, or by their *acquiescence* so long as to render the enforcement of their demands, at this late day, derogatory to the rights, interests, or equities of others, which have resulted from that protracted acquiescence.

As to the statutes of limitations I do not think they affect this case, either directly or by analogy. In general, equity merely follows the analogies of the law in respect to limitations. A court of equity is *bound* to apply the statute only in cases where the courts of law and equity would have concurrent jurisdiction; that is to say, where the complainant might have gone into a court of law with his cause instead of coming into chancery. "In such cases courts of equity consider themselves within the spirit of the statute and act in obedience to it; but, in the consideration of purely equitable rights and titles, they act in analogy to the statute, but are not bound by it." *Hall* v. *Russell,* 3 Saw. 515. "In all cases of concurrent jurisdiction, at law and in equity, statutes of limitations seem equally obligatory in each court; and courts of equity do not act so much in analogy to the statutes as in obedience to them." 2 Story's Eq. Jur. 1520. In a great variety of other cases, however, courts of equity act only upon the *analogy* of the limitations at law, and not in *obedience* to the statutes. A leading and very instructive case on this subject is *Havenden* v. *Lord Annesley,* 2 Sch. & Lefroy, 629 *et seq.*

There is also still another class of cases in which equity courts disregard both the statutes of limitations and the

principle of analogies, and act on considerations peculiar to themselves; that is to say, "on their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross *laches* in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights." 2 Story's Eq. Jur. 1520.

Thus, to recapitulate, there are three classes of cases with reference to the bar of time—*First*, those in which equity is bound to apply the statutes of limitations; *second*, those in which it merely acts in analogy to those statutes; and, *third*, those in which it is neither bound by nor acts upon the principle of analogy to them, but proceeds on doctrines peculiar to and inherent in itself.

The present is not a case of the first class. It is not a case in which the jurisdiction of law and equity is concurrent, and in which the complainants might have gone into one court or the other at option. It is a suit between *cestuis que trust* and a trustee; a case within the exclusive jurisdiction of equity; for, though the law courts have jurisdiction in a few cases of the simpler trusts, yet, in general, equity has exclusive jurisdiction over trusts. "Estates vested in persons upon particular trusts and confidences are wholly without cognizance at common law, and the abuses of such trusts and confidences are beyond the reach of any legal process." 1 Story's Eq. Jur. 29.

It is elementary law that trusts are exclusively within the cognizance of equity. The present is not, therefore, a case of concurrent jurisdiction of law and equity, and is not one in which I am *bound* by the statutes of limitations. Many, and, indeed, most of the suits in chancery, in which the trustee and *cestui que trust* are parties on one side, and others are parties in adverse interest on the other, rank in the first class of cases that have been mentioned, where equity is bound by the statutes of limitations. An instance of such cases was that of *Livesay* v. *Holms,* 14 Grat. 441. A widow had qualified as administratrix of her husband, and taken possession of and held slaves, in which she claimed a life

estate under her father's will. She was afterwards removed from her office of administratrix, but continued to hold the slaves for more than five years after such removal. *Held*, that the statute of limitations will protect her against any claim by the administrator *d. b. n.*, and next of kin of her husband, and that the fact that one of the next of kin had been a married woman during the whole period, will not prevent the running of the statute against her. This was a suit in equity, but might have been brought at law.

Nor do I think the case at. bar falls within the second class of cases that have been described—those in which courts of equity follow the analogies of limitation enforced at law. Those are cases in which, though cognizable exclusively in equity, the reason of the law of limitation applies as cogently as in suits at law. The instances of this class mentioned by Judge Story are suits for real estate, where there has been adverse possession for 20 years, brought, say, by a mortgagee; and suits brought to subject real estate to the liens of judgments, where there has been no effort to enforce the judgments for 20 years. The mere fact that equity has jurisdiction to foreclose a mortgage, or enforce the lien of a judgment, upon real estate, is held not to effect the reason of the law of limitations which bars actions at law after certain periods of time. It cannot be pretended that the present suit falls within that class of cases.

I conclude that it falls within the third class, to-wit, that in which equity, wholly ignoring the statutes of limitations by which the law arbitrarily bars actions after periods of time arbitrarily fixed, assumes the untrammelled prerogative of deciding, upon the circumstances of the particular case before it, whether the complainant has used such diligence in exhibiting his demand as the nature of the case required; and whether, in giving him relief after such delay as has occurred, the court can be certain not only of his right to it, but also that it can be granted without injury to the rights of persons who may be thereby injured in consequence of the delay.

A review of the cases of this latter class which have been decided by courts of equity will reveal a great elasticity in the

period which has been held sufficient to disentitle complainants from recovering their demands. In regard to fraud, though it is settled that no lapse of time will bar so long as it is concealed, and that neither the statute nor the principle of analogy will begin to run except from the time the fraud is unkennelled, yet it is equally settled that if there be laches or acquiescence, and unreasonable delay after that event, equity will then apply its usual principles in determining whether or not to grant the relief demanded. It is equally a rule that, as between a trustee and his *cestui que trust*, neither the statute, nor the rule of analogy, nor lapse of time will, in general, affect the right of the beneficiary to redress; yet equity will in such cases, when the circumstances require it, enforce against the *cestui que trust*, especially where the rights of third persons are concerned, its own peculiar maxim, *vigilantibus et non dormientibus jura subserviunt;* and while there are cases of this class where equity has granted relief after a great length of time, even 50 years, yet there are others in which it has refused it after only a few months.

Among the cases which have been held not to be affected by the statutes of arbitrary limitations, or the rule of analogy to them, are (1) those in which the public convenience requires that there shall be a speedy end of strife; (2) others in which some of the principal parties, in transactions sought to be reviewed, are dead and their vouchers lost; (3) others in which the court could not be certain, from lapse of time, that relief, apparently proper, would certainly be just; (4) others where the disturbance of purchases or transactions acquiesced in for a greater or less time would prejudice the vested rights of third persons. The following are the more important of the cases, falling within the classes which have been named, which have been cited at bar. In *Bryan et al.* v. *Weems*, 29 Ala. 423, it was held that the statute of limitations barred a trustee who had neglected to sue for slaves held subject to a trust during the period of statutory limitation; and that the rights of the *cestui que trust* were also barred. In *Flanders* v. *Flanders*, 23 Ga. 249, which was a suit by the widow of an intestate and a married daughter and husband to set aside

the sale of a slave by the administrator alleged to have been made to himself, more than ten years after the sale was made, it was held to have been brought too late, the widow having been 10 years *sui juris*, and the daughter four years through marriage; the delay being unreasonable.

In *Hough* v. *Coughlan*, 41 Ill. 131, there had been a contract by bond for the conveyance of land, and after 12 years a bill was brought for specific performance, and the court held that there had been unreasonable delay: "That great delay of either party unexplained, in not performing the terms of a contract, or in not prosecuting his rights under it by filing a bill, or in not prosecuting his suit with diligence when instituted, constituted such *laches* as would forbid the interference of a court of equity."

In *Mitchell* v. *Berry*, 1 Met. (Ky.) 619, it was held, where a *cestui que trust* desires to avoid a sale of his estate, at which the trustee has become the purchaser, he must apply to chancery in a reasonable time after he had knowledge of the facts which impeach the sale, or he will be presumed to have acquiesced, and that reasonable time depends upon the circumstances of the case, and the discretion of the court. In the particular case before the court an acquiescence of 12 years was held sufficient to disable the parties from coming into a court of equity.

In *Davison* v. *Jersey Co.* 71 N. Y. 333, there had been a contract for building houses by May 1, 1859, and for purchase and deeds. Suit was brought for specific performance in 1864, and it was held that the rights of complainant were, under the circumstances of that case, forfeited by *laches*.

In *The State* v. *West*, 68 Mo. 229, the testator of defendants, having bought certain land in his own name at a sale made by order of the county court, on the twenty-third day of April, 1873, to satisfy a school mortgage, on the twentieth day of September, 1873, resold it at an advance, and on the second day of January, 1874, died. The county court knew of the purchase by the deceased soon after it was made. On the eighteenth day of June, 1874, 15 months after the purchase, the county court brought suit to recover of defendants

the profits made by deceased on the resale, claiming that he was acting as agent of the county; but the court held that, if the county ever had a cause of action, it had been guilty of such *laches* as made it doubtful if this suit could be maintained. The court say: "Under such circumstances, the *laches* must, of itself, be held fatal, for it would be to assert a doctrine to the last degree hazardous to say that a complainant, with full knowledge of all the facts on which he relies, can lie quietly until death comes to his assistance, and puts a seal of perpetual silence upon the lips of his adversary."

In *Atkinson* v. *Robinson*, 9 Leigh, 393, it was held that every claimant who asks relief of equity ought to exhibit his claim within a reasonable time, so that, in giving him a decree, the court may not do injustice to the defendant.

In *Robertson* v. *Read*, 17 Grat. 544, where there had been a settlement between partners in 1819, and transactions in pursuance of the settlement in 1820, and in subsequent years down to 1831, and suit was brought in 1834 for an account, and claiming money by the administrator of one of the partners who had died against the other partners who were living, it was *held* that a claim, probably just originally, must be rejected and disallowed in consequence of its staleness, and of the probable impossibility, from the lapse of time and the death of parties, of ascertaining the facts of the case and doing justice, and also because it might reasonably be presumed that the said claim had been abandoned or satisfied.

In *Harrison* v. *Gibson*, 23 Grat. 212, it was held that if from the delay which has taken place no correct account can be taken between the parties to the action, and the transactions of parties have become obscured by death of some of them; and if, under the circumstances of the case, it is too late to ascertain the merits of the controversy, the court will not interfere, whatever may have been the original justice of the claim.

In *Hudson* v. *Hudson*, 3 Rand. 117, where a bill for an account had been filed in 1810 for the settlement of transactions of a deceased person's executors, under a will under which they had qualified in 1789, and had been dismissed by

the chancellor on the merits, it was held that any subsequent suit would not be entertained, and that the court would presume, from the long acquiescence of all parties in the action of the executors, that the estate had been finally and properly settled.

In *McKnight* v. *Taylor*, 1 How. 161, it was held by the supreme court of the United States that, in matters of account not barred by the statute of limitations, courts of equity may refuse to interfere, after a considerable lapse of time, from considerations of public policy and from the difficulty of doing entire justice, where the original transactions have become obscure by time, and the evidence may be lost.

In *Badger* v. *Badger*, 2 Wall. 89, the same court, in holding that, except in certain cases, courts of equity will, acting on their inherent doctrine of discouraging, for the peace of society, antiquated demands, refuse to interfere in attempts to establish state trusts, remarked, at page 94: "There is a defence, peculiar to courts of equity, founded upon the lapse of time and the staleness of the claim, where no statute of limitations governs the case. In such cases, * * * courts of equity refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiesence in the assertion of adverse rights. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the party in possession, which will appeal to the conscience of the chancellor." Important learning on the general subject may also be found in *Brown* v. *Brown*, 95 U. S. 161; *Goddin* v. *Kimmell*, 99 U. S. 211; and *Wood* v. *Carpenter*, 101 U. S. 235.

The case at bar, if it falls within any class of cases which have been described, and of which examples have been cited in the foregoing review, falls within that alluded to in the case of *Badger* v. *Badger* last cited, where the long acquiescence of the parties claiming rights, in the action of those against whom they claim, has created a presumption that they have abandoned their rights, and where the enforcement

of those rights now would produce hardship and injustice to third persons.

Perry says, (see 2 Trusts, § 870:) "Acquiescence in a transaction may bar a party of his relief in a very short time. If one has knowledge of an act, or it is done with his full approbation, he cannot afterwards have relief. He is estopped by his acquiescence, and cannot undo that which has been done." He cites the English cases of *Kent* v. *Jackson*, 14 Beavan, 384; *Styles* v. *Guy*, 1 Hall & Twells, 523; and *Ex parte Morgan*, 1 Hall & Twells, 328, which I have not been able to consult.

In the case of *Graham* v. *Railroad Co.* 2 McNaughton & Gordon, 156, 158, Lord Cottenham, refusing relief after an acquiescence of only 18 months, said that the question was whether the equity set up by the complainant was not counteracted by a counter equity on the other side; "for in many cases the interposition of the court may produce the greatest possible injustice if the parties have not applied in time, but have permitted things to get in that state which makes the injunction asked for not only a proceeding not enforcing an equity, but calculated to inflict great hardship and injustice." And in another place, in the same case, he says: "If those who have the management of the affairs of others depart from the regular course, and there is an acquiescence, the parties interested who have so acquiesced cannot complain."

It being, therefore, a settled doctrine of equity jurisprudence that men may bar themselves of equitable rights by such acquiescence, as, if those equities were enforced, would injuriously affect the interests or rights or equities of third persons, it is obvious that this acquiescence and its results must be considered by a court of equity with no reference to the arbitrary periods established as bars to suits by statutes of limitations; and, as to such cases, nothing could be more mistaken than the remark of the dissenting judge in the Missouri case of *The State* v. *West*, that to apply the doctrine in a case where there was an acquiescence for only 15 months, as that was, "would be going far beyond any decision ever made in England or America."

This being a recognized doctrine of equity, I have now to inquire whether there was an acquiescence in the action of Frederick Marx, in regard to the confederate bonds, such as created counter equities which would be overthrown by granting the relief sought by the complainant and petitioners in this cause.

It abundantly appears from the record that to grant this relief would sweep away the whole estate of Frederick Marx, and leave nothing for his creditors at large, whose claims exceed $5,000. It is claimed in the pleadings, and is doubtless conceded by all the parties to this cause, that Frederick Marx was an honorable man, and would not have contracted debts to so large an amount as $5,000 if he had not felt assured that no reclamation would be made upon him for his illegal investment in confederate bonds. But even though he had been capable of incurring these debts in a condition of conscious insolvency, yet, if suit had been brought within a reasonable time after the close of the war, his credit would, most probably, have been so impaired that the present creditors of the estate would not have been apt to trust him to the extent of $5,000.

I cannot but believe that this large indebtedness to general creditors is the result of the acquiescence of the complainant and petitioners in his illegal investments for a period of 12 years after they could have sued him, and during the whole remainder of his life. By their own neglect to sue they perpetuated his credit with the public, and they threw him off his guard in the contraction of debts. It is very clear that they might have sued as early as the spring of 1866, when the courts of Virginia were re-instated under the Pierpoint government. The stay laws of Virginia, enacted during the war, affected little other than final process for the collection of debts, and sales under decrees and trust deeds. They forbade no other proceedings in court than trials by jury, and put no restriction whatever upon suits in equity. So, likewise, the stay laws of 1866 and 1867 stayed only the "collection of debts." Suits might be brought for the *establishment* of debts *ad libitum*, in Virginia, from the spring of 1866 to the present

time, and their *collection* was stayed no longer than the first of January, 1869 ; eight years and a month before this suit was brought. Suits might have been brought in this court at any time after 1865. Certainly an acquiescence of more than 11 years in the action of this trustee, accompanied by such assurances as those given eight years before death by Frank M. Etting, in his letters of March and July, 1869, which have been quoted, and by results in the form of new debts incurred afterwards to the amount of $5,000, which are hopeless of payment, if the demands of the complainant and petitioners are allowed, would seem sufficient to bring the case within the doctrine of the loss of equities by acquiescence.

As may be inferred from the foregoing, I do not agree with counsel for complainants in the proposition that Mrs. Etting was barred from suing by coverture, or that the complainants were barred from suing by being otherwise not *sui juris.*

In *Harrison* v. *Gibson*, 23 Grat. 212, it was held that though a bill by husband and wife in right of the wife is the bill of the husband, and the wife is only joined for conformity, yet the coverture of the wife is not therefore an excuse for delay in bringing suit; and it was also held that though a delay of 14 years after a right has accrued does not create a statutory bar, it will, in connection with other circumstances, be very persuasive against the justice of the claim, which the court in that instance refused to sustain.

I think the bill and petitions must be dismissed. I will so decree.

NOTE. There was no appeal in this case, the complainants acquiescing in the decision of the court.