## MAY *v.* SLOAN.

1. The word "trade" in its broadest signification includes not only the business of exchanging commodities by barter, but that of buying and selling for money, or commerce and traffic generally.
2. Where, to effect a settlement of all his indebtedness to B. and C., who each held a mortgage upon his lands and personal property, A. entered into an agreement in writing with them, containing sundry provisions, by one of which C. stipulated "not to interfere with any *bona fide* trades made by A., so far as any of the mortgaged property is concerned, provided the trades have been carried out in good faith and completed," — *Held*, that a sale by A. to B. of a portion of the lands, which was known to C., and evidenced by an instrument under seal, was a trade within the meaning of the agreement.
3. Where an agreement for the sale of lands, alleged in a bill in equity praying for specific performance, is denied by the answer, the defendant, where there is no written evidence of such agreement, may, at the hearing, insist on the Statute of Frauds as effectually as if it had been pleaded.
4. Where the record shows that the appellee, who raises the objection that the lands which are the matter in controversy are not of sufficient value to give this court jurisdiction, bought them for $21,000, and by virtue of that purchase claims them here, and the prayer for appeal, which is verified by the affidavit of the appellant, shows that they are worth more than $5,000, — *Held*, that this court has jurisdiction.

APPEAL from the Circuit Court of the United States for the Northern District of Florida.

The facts are stated in the opinion of the court.

*Mr. Samuel Field Phillips* for the appellant.
*Mr. Charles N. West* for the appellee.

Mr. JUSTICE BRADLEY delivered the opinion of the court.

This was a bill in equity filed in the Circuit Court for the Second Judicial Circuit of Florida, by Andrew M. Sloan, against Asa May, to compel the latter to convey to the complainant a certain tract of land situated in Jefferson County, Florida,

known as the Alvin May place, containing about eleven hundred acres; and for an injunction against his attempting to obtain possession of the land pending the suit. The case was removed into the Circuit Court of the United States for the Northern District of Florida, and the appeal is from the decree of that court, rendered in favor of Sloan.

A preliminary point is made as to the jurisdiction of this court, on the ground that it does not appear that the matter in dispute exceeds the value of $5,000. This objection is untenable. It does appear from the record that the appellee, who raises the objection, purchased the land for the price of $21,000; and it is by virtue of that purchase that he claims it in this suit. Then again, the petition of appeal to this court, which is verified by the affidavit of the appellant, distinctly avers that the matter in dispute is a large body of land worth more than $5,000 in value. No attempt is made to controvert this allegation, and we think that it sufficiently appears that the case is within our jurisdiction.

The facts as set forth in the bill and answer, and developed by the proofs, are substantially as follows: —

In 1868, Asa May, the appellant, sold and conveyed to his relative and friend, Alvin May, a plantation in Jefferson County, Florida, called the Asa May place, consisting of about twelve hundred acres of land, for the sum of $14,848 in gold; and received in payment eight sealed notes, payable at intervals of one year, with interest, seven of which were for $2,000 each, and the eighth for the balance. To secure the payment of these notes, Alvin gave to Asa May a mortgage on the property sold, and on two other plantations adjoining, one called the Picolata place, containing six hundred and fifty acres, and the other called the Alvin May place (being the property in question), containing about eleven hundred acres. Various payments were made on this debt, amounting, as Alvin May testified, to from $9,000 to $11,000.

Alvin May, besides the above property, became the ostensible owner of several other plantations in the vicinity, and became indebted to A. M. Sloan & Co., commission merchants in Savannah, for money lent and advanced and supplies furnished, to an amount exceeding $50,000. To secure this indebtedness,

in January, 1872, he gave to Sloan & Co. three notes, one for $16,831.28, one for $18,777.14, and one for $20,696.78, payable respectively on the first days of January, 1873, 1874, and 1875; and executed to Sloan & Co. a mortgage on the same property previously mortgaged to Asa May, and on several other tracts of land, namely, one called the Elbow tract, containing six hundred and sixty acres, one called the Arendell tract, containing over a thousand acres, one called the McCain place, containing about eleven hundred acres; and a small tract of one hundred and fifty acres, called the S. F. May place. Both mortgages embraced all the personal property on the lands mortgaged, or that might thereafter be thereon.

Alvin May being unable to pay this indebtedness, in May, 1873, Asa May and Andrew M. Sloan (who succeeded to the rights of A. M. Sloan & Co.) severally brought suits against him, and recovered simultaneous judgments, upon which executions were duly issued. Asa May's judgment was for $5,782.15; but the whole balance due to him for principal and interest on his mortgage, including the amount of said judgment, was upwards of $13,000. Sloan's judgment was for $13,811.66, being only upon the note given to his firm which had first matured, — the other two notes not being due. Subsequent judgments were obtained by other parties, and executions sued out thereon.

To obviate the necessity of an actual levy on his property, and to save the expense of advertising, Alvin May, in October, 1873, agreed with the sheriff that no part of the property should be removed, that the sale might take place on the first Monday of December, 1873, and that the proceeds should be distributed according to the rights of the creditors. The sale was afterwards postponed to the first Monday of January, 1874. It was understood that the property to be sold would be the three plantations included in Asa May's mortgage and all the personal property, including mules, farming utensils, and crops. It seems that Sloan had a lien for advances on the crop, independent of his execution and mortgage. The reason why the several tracts covered by Sloan's mortgage, and not covered by Asa May's, were not proposed to be sold at the same time does not clearly appear, except that the title to the McCain place had

failed, and the Arendell place, as will be seen, was allowed to be retained by Alvin May free of Sloan's mortgage. The other two tracts, namely, the Elbow tract, and the S. F. May place, may have been reserved for the remaining notes held by Sloan which were not yet due.

On the 13th of December, 1873, Alvin May, the debtor, and Andrew M. Sloan, made the following written agreement:—

" State of Florida, County of Jefferson : Memorandum made and entered into this thirteenth day of December, A.D. 1873, by and between Alvin May and Andrew M. Sloan, relative to the sale of the lands and personal property hereinafter specified.

" The said May, in consideration of one dollar, in hand paid, of twenty-one thousand dollars to be paid by the said Sloan, bargains and sells to the said Sloan the lands owned by him in said county, known as the Lang place, the Gamble eighth, the Harvey forty, and twenty acres belonging to the Gorman eighth, and the Murray land, comprising eleven hundred acres, more or less; also, six mules, one thousand bushels of corn, one four-horse and one two-horse wagon, the said lands comprising the home settlement, the house formerly occupied by the said Alvin May, and the other tenements and improvements thereon. The said May is to give a good title to the same, and the same is to sell in such way as to make the title perfect at sheriff's sale, if necessary, to satisfy the judgments now upon record, or mortgages now existing, and the payments are to be made upon the claims existing against the said May, and in favor of the said Sloan. The said Sloan is to have possession immediately, and the said May is to vacate the houses by the first day of January, or sooner, if possible.

" Witness our hands and seals, this 13th of December, A.D. 1873.
" A. M. SLOAN.    [SEAL.]
" ALVIN MAY.    [SEAL.]
" Signed, sealed, and delivered in our presence :
" A. DENHAM.
" M. PALMER."

It is conceded that the lands which form the subject of this agreement constituted the Alvin May place, now the subject of controversy, and were included in Asa May's mortgage.

The evidence establishes, we think, that, in pursuance of this agreement, Sloan did take possession of portions of the property

on the 1st of January, 1874, and has ever since continued to occupy the same.

On the 5th of January, the day before the sale was to take place, Asa May, Alvin May, and Andrew M. Sloan had a meeting at the office of Mr. Pasco, an attorney at Waukenah, in the neighborhood of the property, and entered into the following agreement : —

" *Memorandum of Propositions to Alvin May by Asa May and A. M. Sloan, relative to Settlement of Indebtedness.*

" The property subject to the mortgages and execution of the said May and Sloan is to be sold on the first Monday in January, 1874, under the executions against Alvin May. Unless there are other purchasers ready to bid the amount of Asa May's claim, he is to buy in the property for his own use.

" If Asa May buys the property, he agrees that if Alvin May and wife will relinquish all right and title, including her right of dower, to the property sold, that the Arendell plantation shall be given up to Alvin May; that Asa May will pay up or guarantee the payment of the balance due to Arendell's creditors on the Arendell place, the said amount not to exceed $3,000 at the present time; and that the said Asa May and Sloan will make no further claim to the said place, and will permit the title to rest in Alvin May or his wife.

" Asa May and Sloan bind themselves to make no further personal claim upon Alvin May on account of the mortgage and judgment debts of theirs against him; Asa May agrees to let Alvin May have          mules of those bought in, and          bushels of corn, and          pounds of fodder, to enable him to work the Arendell place, the value of the mules to be deducted from the $3,000. Alvin May is to give peaceable possession of the property as soon as possible, so as to enable Asa May to proceed at once to make his arrangements for the coming year.

"Alvin May is to bring up a memorandum of all the property subject to the mortgage and executions against him, early on the morning of the sale, and is to get in as many as possible of the mules sold by him and not paid for, or paid for only in part. The amount of $3,000 embraces the entire amount to be paid by Asa May, whether it is paid on the land, in mules, or in any other manner. Asa May agrees not to interfere with any *bona fide* trades made by Alvin May, so far as any of the mortgaged property

is concerned, provided the trades have been carried out in good faith, and completed.

" Witness our hands and seals, this fifth day of January, A.D. 1874.

" ASA MAY.          [SEAL.]
" A. M. SLOAN.      [SEAL.]
" ALVIN MAY.        [SEAL.]

" Executed in our presence :
            " A. DENHAM.
            " S. PASCO."

The last clause of this agreement constitutes one of the principal grounds of the present controversy.

On the 6th of January, 1874, sale took place under the executions. Asa May bid off the three tracts of land covered by his mortgage at fifty cents per acre ; namely, the Asa May place, the Picolata place, and the Alvin May place ; also nine mules, one pony, one mare, three two-horse wagons, one six-horse wagon, one log-cart, a sugar-mill, and a buggy and harness. Sloan bid off the fodder, a four-horse wagon, a cotton-gin, and two sugar-kettles. One Whitfield bid off fifteen hundred bushels of corn, which he afterwards surrendered to Sloan under the latter's plantation lien.

The proceeds of the sale of the lands, mules, plantation implements, &c., amounting to about $3,000, were applied to Asa May's mortgage ; and the proceeds of the sale of the corn and fodder, amounting to about $1,260, were applied to Sloan's plantation lien for advances. It does not appear that any money passed; the application of the proceeds of sale was made by simply crediting the amounts. Sloan received the articles which had been sold to him by Alvin May by the agreement of Dec. 13, 1873, though the mules and one of the wagons were bid off by Asa May, who afterwards purchased the mules and the corn and fodder from Sloan. The sheriff executed a deed to Asa May for the real estate in accordance with the sale.

The object of this suit is to compel Asa May to convey to Sloan, the complainant, the Alvin May place according to what he alleges was the agreement and understanding between the parties, and the intent and meaning of the last clause in the agreement of Jan. 5, 1874.

If the case depended upon the parol agreement set up by the complainant, whereby he claims that Asa May bound himself to convey the land to him, no relief could be granted on this bill. The Statute of Frauds would be a complete bar. The defendant in his answer denies that any such agreement was made. Such a denial is as effective for letting in the defence as if the Statute of Frauds had been pleaded. Sugden, Vendors and Purchasers, 150, c. 4, sect. 6, par. 5.

This renders it unnecessary to examine minutely the testimony on the question thus put in issue by the parties. Had the complainant succeeded in proving such an agreement, it could not have availed him. But the fact is, that he did not succeed in making such proof. The evidence is conflicting on the subject. The fact being denied in the answer, it would have required evidence tantamount to the testimony of two witnesses to establish it; whilst we have only that of the complainant himself, in which he is contradicted by the defendant and by Alvin May and Pasco, the attorney.

The question must stand, then, on the construction to be given to the written agreement of Jan. 5, 1874, in view of the surrounding circumstances and the acts of the parties. Does the last clause of that agreement by its terms embrace the transaction contained in the contract made by Alvin May and Sloan on the 13th of December, 1873? Was that transaction a "trade" made by Alvin May relating to the mortgaged property, within the meaning of the terms? Was it a "trade" carried out in good faith and completed?

The word "trade," in its broadest signification, includes not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally. There is nothing in the manner in which it is used in the clause in question to limit its meaning. Asa May was to buy in the property for his own use. This was the general purport of the agreement. But it was added that "Asa May agrees not to interfere with any *bona fide* trades made by Alvin May, so far as any of the mortgaged property is concerned, provided the trades have been carried out in good faith and completed." Now certainly the agreement of December 13, between Alvin May and Sloan, was a trade,

within the broad meaning of the term. It was a trade relating to a portion of the mortgaged property. It appears to have been made for full consideration and in good faith. Asa May, when put on the stand, although he denied that by the clause in question he intended to confirm or to agree to carry out the agreement of December 13, yet he could not deny that he knew of its existence; and Pasco, the common attorney of the parties, knew all about it, and had it in his possession when the agreement of January 5 was made in his office. It cannot be said, therefore, that it was a secret agreement, withheld from the knowledge of Asa May, or that any fraud or bad faith was practised upon him in relation to it. It was also a completed agreement, so far as it could be completed without the execution sale itself, which was contemplated as part of the means of carrying it out. The title was to be made good in that way if necessary, and it cannot be disputed that it was necessary. The weight of evidence also is, that the sale had been carried into effect by delivery of possession by Alvin May to Sloan. It is true that as to a portion of the place there is conflicting testimony on this point. Asa May, after the sale, worked a portion of it; though it is not disputed that Sloan was in possession of the residue. In this connection the conduct of the parties in relation to the mules and other personal property included in the agreement of December 13 cannot be overlooked. Although bid off by Asa May, by whose mortgage it was covered, yet Sloan's claim to it was respected, and Asa May soon afterwards actually purchased the mules from Sloan.

If we look to the surrounding circumstances existing at the time, it will be difficult to resist the conclusion that the sale by Alvin May to Sloan of the property in question was one of the trades to be respected by Asa May. At the time of the sheriff's sale he had already received some $10,000 from Alvin May on the principal and interest of the purchase-money for the place he had sold him, and there was about $14,000 still due. By the sheriff's sale and the agreement of Jan. 5, 1874, he not only got back the original Asa May place, which was all the property he had ever parted with, but the Picolata place adjoining, containing over six hundred and fifty acres, which is stated in the bill, and is not denied, to be a valuable

tract of land. It is true that he agreed to give Alvin May an additional $3,000; but it must be recollected that he also got a considerable personal property, the full amount of which does not appear, and a release of dower from Alvin's wife. This was Asa May's situation, and the result of the agreement as it affected him, if construed as we have suggested.

Now, what were the circumstances of Sloan's case? His debt was between $50,000 and $60,000. Besides the lands covered by Asa May's mortgage, he had a mortgage on the McCain place of eleven hundred acres, on the Arendell place of a thousand acres, on the Elbow tract containing six hundred and sixty acres, and on the S. F. May place containing one hundred and fifty acres. He also had a lien on the crop. The McCain place failed in the matter of the title; and in the agreement of Jan. 5, 1874, he agreed to give up to Alvin May all claim on the Arendell tract, to release him from all personal obligation, and to allow $21,000 (its full value) for the Alvin May place; leaving still due to him between $30,000 and $40,000, with only the Elbow tract and S. F. May place as security. Now, why should he have given up the Arendell tract, and all personal claim against Alvin May? And why should this be stipulated for in an agreement between him and Alvin May and Asa May? — an agreement which is entitled " Memorandum of propositions to Alvin May by Asa May and A. M. Sloan, relative to settlement of indebtedness." What did he get? What came to him in the transaction? Nothing, — absolutely nothing, unless the clause in question, at the end of the paper, is to be construed as embracing the agreement of December 13, by which he was to have the Alvin May place at $21,000, on account of his claim.

In the light of all these circumstances, it is hard to resist the conclusion that the word " trade " in the agreement of Jan. 5, 1874, was used by the parties in its broadest signification, so as to include any bargain or sale. As such a meaning of the term is admissible, we think that the circumstances and acts of the parties show that it must have been intended. This being conceded, it plainly became the duty of Asa May, after having purchased the property, to convey the land in question to the appellee.

*Decree affirmed.*