UNITED STATES v. DOUGLAS.

(Circuit Court of Appeals, Eighth Circuit. September 20, 1911.)

No. 3,487.

1. INDIANS (§ 4*)—"TRADE" WITH INDIANS—GOVERNMENT EMPLOYÉS—STATUTES.

Rev. St. § 2078, provides that no person employed in Indian affairs shall have any interest or concern in any trade with the Indians, except for and on account of the United States, and any person offending shall be liable to a penalty of $5,000 and shall be removed from office. Indian Appropriation Act July 4, 1884, c. 180, 23 Stat. 76, declares that where Indians are in possession or control of cattle or their increase, which have been purchased by the government, such cattle shall not be sold to any person not a member of the tribe to which the owners of the cattle belong, or to any citizen of the United States whether intermarried with the Indians or not, except with the consent in writing of the agent of the tribe to which the owner or possessor of the cattle belongs. *Held*, that the word "trade" was used in section 2078 in its ordinary sense, to mean the act or business of exchanging commodities either by barter or by buying and selling for money; commerce; traffic; barter; and hence such section prohibited a female industrial school teacher, while employed by the government, from purchasing from Indians cattle furnished by the United States and issued to them.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 4.*

For other definitions, see Words and Phrases, vol. 8, pp. 7037–7042.]

2. INDIANS (§ 4*)—PROTECTION—STATUTES—OFFENSES.

Act Cong. April 18, 1796, c. 13, § 3, 1 Stat. 452, establishing trading houses with Indian tribes, provided that agents, their clerks, or other persons employed by them, shall not be directly concerned or interested

in carrying on the business of trade or commerce on any other than the public account. Section 7 declared that if any agent, or agents, their clerks, or other persons employed by them, shall purchase or receive of any Indian by way of trade or barter a gun or other article commonly used in hunting, any instrument of husbandry, or cooking utensils of the kind usually obtained by Indians in their intercourse with white people, or any article of clothing, excepting skins or furs, he shall forfeit $100 for each offense. *Held*, that there were two notable distinctions between the offenses described in the two sections, viz.: (1) Section 3 prohibited the carrying on of a business, rather than specific acts of purchase or sale, while section 7 provided for punishing each act of barter of the classes named as a separate offense. (2) Section 3 also prohibited certain persons engaging in the business of trade or commerce, except on government account, while section 7 prohibited certain trade, whether on account of the government or otherwise.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 4.*]

In Error to the District Court of the United States for the District of South Dakota.

Action by the United States against Jennie L. Douglas. Judgment for defendant, and plaintiff brings error. Reversed and remanded, with directions.

Edward E. Wagner, U. S. Atty.

Aikens & Judge, for defendant in error.

Before ADAMS and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. This action was brought by the United States to recover a penalty of $5,000 under section 2078 of the Revised Statutes, which reads as follows:

"No person employed in Indian affairs shall have any interest or concern in any trade with the Indians, except for, and on account of, the United States; and any person offending herein, shall be liable to a penalty of five thousand dollars, and shall be removed from his office."

The facts are not in dispute. The defendant is one-sixteenth Sioux Indian, and during all times here material was a member of the Crow Creek band of Indians, and resided at the Crow Creek Indian agency in South Dakota. She was during said period also a citizen of the United States. She was for many years employed by the government as a female industrial teacher, and while so employed between January 3, 1907, and August 31st of the same year she purchased from Indians on said reservation 256 head of cattle, branded "I. D.," being cattle furnished by the United States and issued to said Indians. She supposed she had a right to do so. It does not appear whether the Indians of whom she bought cattle were citizens of the United States or not. It is probably to be presumed that they were not. Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643. The District Court found that she was not liable to the penalty prescribed by section 2078, R. S., and entered judgment for her, and the government appeals.

[1] The principal question in this case is: Did the defendant, in making the purchases in question, have an interest or concern in any

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

trade with the Indians, within the meaning of the section of the Revised Statutes quoted? There is a secondary question as to whether the statute in question was in any wise modified, limited, or explained by one of the provisions of the Indian appropriation law passed July 4, 1884, hereafter set out.

It is contended that trade with the Indians as used in the section of the Revised Statutes quoted did not cover or include such purchases as were made by the defendant. The statute in question, being penal in nature, should, of course, be strictly construed. There is little if any conflict as to the usual and ordinary meaning of the word "trade." It is defined in Webster's International Dictionary as:

"The act or business of exchanging commodities by barter or by buying and selling for money; commerce; traffic; barter."

The Century Dictionary defines it as:

"The exchange of commodities for other commodities or for money. The business of buying or selling, dealing by way of exchange, commerce, traffic. Trade comprehends every species of exchange or dealing either in the produce of land, in manufactures, or in bills or money."

In the New American Encyclopædic Dictionary it is defined as:

"The act, occupation or business of exchanging commodities for other commodities or for money. The business of buying and selling; dealing by way of sale or exchange; commerce; traffic."

In Bouvier's Law Dictionary it is said:

"In its most extensive signification the word includes all sorts of dealings by way of sale or exchange."

In Rapalje and Lawrence's Law Dictionary it is defined as:

"Traffic; commerce; exchange of goods for other goods or for money."

In 28 American and English Encyclopædia of Law, 338, it is said:

"In ordinary language the word 'trade' is employed in three different senses: First, in that of the business of buying and selling; second, in that of an occupation generally; and, third, in that of a mechanical employment in contradistinction to agriculture and the liberal arts."

In May v. Sloan, 101 U. S. 237, 25 L. Ed. 797, it is said:

"The word 'trade,' in its broadest signification, includes not only the business of exchanging commodities by barter, but the business of buying and selling for money or commerce and traffic generally."

In Queen Insurance Company v. State, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483, and in Texas Coal Company v. Lawson, 89 Tex. 401, 34 S. W. 920, it is said:

"The word 'trade' means traffic, which is defined to be the passing of goods and commodities from one person to another for an equivalent in goods or money."

It has further been judicially defined as:

"The exchange of commodities for other commodities or for money; the business of buying and selling; dealing by way of sale or exchange." In re Grand Jury (D. C.) 62 Fed. 840; U. S. v. Cassidy (D. C.) 67 Fed. 705; U. S. v. Coal Dealers' Association (C. C.) 85 Fed. 265.

Similar citations could be almost indefinitely multiplied. It is manifest that, if the word "trade" was employed in the statute in question in its ordinary use and acceptation, the defendant had both interest and concern in trade with the Indians on her own account, and not on account of the United States.

It is contended that an examination of the laws prior to the enactment of section 2078 of the Revised Statutes, which was, with a slight modification, taken from Act June 30, 1834, c. 162, § 14, 4 Stat. 738, would reveal that the word "trade," as used in that statute, did not include such purchases as those made by defendant. The construction of various acts of Congress of widely different dates should be entered on mindful of the history of the advance of sentiment with reference to the Indians and their relations to our people.

It would probably be accurate to say that in a legal sense they have always been regarded as an alien, but dependent, people. Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643. But it is to the credit of the government that there has been from the earliest times an increasing sense of our obligations to them in their dependency. In the early times it was the custom to treat Indian tribes as so far foreign that treaties were made with them under subdivision 2 of section 2 of article 2 of the Constitution; but in 1871 Congress by an act provided that:

"Hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty." Act. March 3, 1871, c. 120, 16 Stat. 566.

Since that time many agreements have been made with them, but none by treaty. It was after this change of policy that the statutes were revised in 1874 to December 1, 1873, and it was, in this revision that the section in question first appeared in its exact present form. We have gradually emerged from that state in which we accentuated the alien character of the Indians by making treaties with them as foreign powers, and now treat them as wards of the government under tutelage for American citizenship. Our policy with the Indians has at times been influenced by the existing state of war or peace and by the relative strength and difficulties of the parties at the time. In June, 1775, long before the adoption even of the Articles of Confederation, Congress prohibited any person from trading with the Indians without a license from one or more of the commissioners; and in April, 1776, it provided for the employment of a schoolmaster to teach the youth of the Delawares. Article 9 of the Articles of Confederation contains the following provision:

"The United States in Congress assembled shall also have the sole and exclusive right and power of * * * regulating the trade and managing all affairs with the Indians, not members of any of the states, provided that the legislative right of any state within its own limits be not infringed or violated."

The treaty of October 22, 1784 (7 Stat. 15), with the Six Nations received them into the protection of the United States, and from that time on practically every treaty with the Indian tribes declared them

under the sole protection of the United States. The Ordinance of 1787 provided that:

"The utmost good faith shall always be observed toward the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights, and liberty they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall, from time to time, be made, for preventing wrongs being done to them, and for preserving peace and friendship with them."

Subdivision 3 of section 8 of article 1 of the Constitution confers upon Congress power to regulate commerce with foreign nations and among the several states and with the Indian tribes. July 22, 1790, the First Congress passed "An act to regulate trade and intercourse with the Indian tribes." Act July 22, 1790, c. 33, 1 Stat. 137. The plan then adopted was very simple. Any proper person could obtain a license for two years to trade with the Indians, upon giving bond in the sum of $1,000 for the true and faithful observance of governmental rules, regulations, and restrictions. March 1, 1793, the Second Congress passed "An act to regulate trade and intercourse with the Indian tribes." Act March 1, 1793, c. 19, 1 Stat. 329. This in many points was quite similar to the act of the First Congress, but in the sixth section provided:

"That no person [that is, not even a regularly licensed trader] shall be permitted to purchase any horse of an Indian, or of any white man in the Indian territory, without special license for that purpose."

It appears that even thus early Congress realized that the Indians required even more protection against purchases of horses from them than as against persons vending merchandise to them. The plan was adhered to, however, of leaving trading with the Indians wholly to private enterprise.

[2] April 18, 1796, the Fourth Congress made a radical change by passing "An act for establishing trading houses with the Indian tribes." Act April 18, 1796, c. 13, 1 Stat. 452. Under this law the President was authorized to establish trading houses with the Indians, for the purpose of carrying on a liberal trade with the several Indian nations within the limits of the United States. It will hereafter appear that this included, not only selling goods to the Indians, but acquiring such property from them as they had to dispose of by sale or barter. The act did not contemplate the carrying on of this trade for profit, but practically provided for the selling of goods to the Indians at cost. Thus was recognized more fully than before the dependent character of this alien people, and it was thus sought to reasonably protect them against the cupidity of private enterprise. Every agent was required to make oath or affirmation that he would not, "directly or indirectly, be concerned or interested in any trade, commerce or barter, with any Indian or Indians whatever, but on the public account." By section 3 of this act it was provided:

"That the agents, their clerks, or other persons employed by them, shall not be, directly or indirectly, concerned or interested in carrying on the business of trade or commerce, on their own, or any other than the public account."

Any person, on conviction of violating this section, was required to be removed from his employment and forever disqualified from holding any public office under the United States and **pay a** forfeit of not to exceed $1,000.

Section 7 of this act provided:

"That if any agent or agents, their clerks, or other persons employed by them, shall purchase, or receive of any Indian, in the way of trade or barter, a gun or other article commonly used in hunting; any instrument of husbandry, or cooking utensil, of the kind usually obtained by Indians in their intercourse with white people; any article of clothing (excepting skins or furs) he or they shall, respectively, forfeit the sum of one hundred dollars for each offense."

It is strenuously contended that section 7 clearly shows that the prohibition of section 3 did not extend to ordinary purchases from the Indians. Two broad and notable distinctions exist between the offenses in section 3 and section 7. Section 3 prohibits carrying on a business rather than specific acts of purchase or sale. Under it in all probability there could be only one punishment inflicted for all the acts of barter up to the commencement of a prosecution. Section 7 provided for punishing every act of barter of the classes named as a separate offense. Section 3 prohibited certain persons engaging in a certain business except on government account, and section 7 prohibited certain trade on government or other account. It cannot be said, as claimed, therefore, that purchases from the Indians were not included in the prohibition of section 3.

May 19, 1796, the same Congress, at the same session passed "An act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers." Act May 19, 1796, c. 30, 1 Stat. 469. It was provided by section 7 that any citizen or other person residing in the United States, or either of the territorial districts of the United States, might be licensed as a trader substantially as provided in the acts of 1790 and 1793. By section 8 punishment was prescribed for unlicensed traders, and by section 9 it was provided that if any such citizen, or other person, should purchase or receive of any Indian, in the way of trade or barter, a gun, or other article commonly used in hunting, any instrument of husbandry, or cooking utensil, of the kind usually obtained by the Indians, in their intercourse with white people, or any article of clothing, excepting skins or furs, he should forfeit a sum not exceeding $50, and be imprisoned not exceeding 30 days. It will be observed that this had reference to private traders, and not to the agents or employés of the government, which has more and more come to be regarded as standing substantially in the relation of guardian of the Indian during his period of tutelage. Substantially this same offense, if committed by an agent or employé of the government, was to incur double the forfeiture under section 7 of the act of the same Congress just referred to. So far as these trades with reference to indispensable articles of daily use might be concerned, every transaction was made a separate offense, but was regarded as more heinous when committed by the agent of the guardian people.

March 3, 1799, the Fifth Congress passed "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the

frontiers." Act March 3, 1799, c. 46, 1 Stat. 743. This was largely a re-enactment of the act of the Fourth Congress. The tenth section of this act contained a similar provision to that in section 6 of the act of March 1, 1793, prohibiting a citizen or resident, even though a licensed trader, from purchasing horses of the Indians without a special license therefor.

Up to this time the laws both with reference to government trading houses and private trading with the Indians were by their terms temporary; but on March 30, 1802, the Seventh Congress passed a permanent "Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." Act March 30, 1802, c. 13, 2 Stat. 139. Sections 7, 8, 9, and 10 of this act were substantially identical with sections 7, 8, 9 and 10 of the act of March 3, 1799.

The act of April 21, 1806, "for establishing trading houses with the Indian tribes" (Act April 21, 1806, c. 48, 2 Stat. 402), by section 2 provided for the appointment of a superintendent of Indian trade and required him to swear or affirm that he would not directly or indirectly be concerned or interested in any trade, commerce, or barter but on the public account; and by section 5 every agent was required to so make oath or affirmation. Section 11 of this act was substantially identical with section 7 of the act of April 18, 1796. The exception as to skins and furs in section 9 of the act of May 19, 1796, became of increased importance, because it was clearly apparent from this act of April 21, 1806, that the government at its trading houses was engaged in the acquisition of furs and peltry on government account.

March 2, 1811, the Eleventh Congress passed a new law "for establishing trading houses with the Indian tribes." Act March 2, 1811, c. 30, 2 Stat. 652. This was as to most points here under consideration substantially like the act of April 21, 1806. It again specifically recognized that one of the purposes of the trading house was to acquire for the government furs and peltry. In section 6 it emphasized that the trading houses were to be places for acquiring from the Indians such property as they had to dispose of by sale or barter, as well as to dispose of goods to the Indians, by providing:

· "That the superintendent of Indian trade, the agents, or their clerks, or other persons employed by them shall not be directly or indirectly concerned or interested in carrying on trade or commerce in any of the goods or articles bought for, or supplied to, or received from the Indians."

This amounted to substantially an express declaration that one of the purposes of trading houses was to acquire property by barter or purchase from the Indians; but, not satisfied with prohibiting the government employés from competing with the government in its trade either of sale or purchase, the same section further provided that:

"The said agents, assistant agents, or any persons employed by them, shall not be directly or indirectly concerned or interested in carrying on the business of trade or commerce, on their own or any other than the public account."

The latter provision can only have one interpretation. Having already prohibited the government employé from being concerned in trade in articles bought for, supplied to, or received from the Indians,

the second prohibition can only have been intended to prohibit the government agents from being concerned in the business of trade in articles not bought for, supplied to, or received from the Indians by the government. These provisions throw considerable light on the meaning of section 7 of the act of April 18, 1796, section 9 of the act of May 19, 1796, sections 9 and 10 of the act of March 3, 1799, sections 9 and 10 of the act of March 30, 1802, and section 11 of the act of April 21, 1806. It has already been stated that section 7 of the act of May 19, 1796, was a prohibition of the purchase of articles there enumerated either on individual or government account. The whole purpose was to prevent the Indian from improvidently parting with his indispensable articles, either to the government or to any one else. How absurd it would be to assume that there was any other purpose, when as early as 1796 an exception was made of skins and furs. The government was engaged in buying and trading for skins and furs on its own account. Did Congress then provide that its own paid agents in charge of such purchases might compete with it, and buy on their own account skins and furs?

The sections of the statutes are all clear and consistent, if these various sections prohibiting government servants from buying certain articles refer to purchases whether upon government or individual account; and, so construed, none of the prior statutes cited have any real bearing on the meaning of the word "trade" as finally used in section 2078 of the Revised Statutes.

June 30, 1834, the Twenty-Third Congress passed two Indian acts. The first, "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers" (Act June 30, 1834, c. 161, 4 Stat. 729), prohibited any one except an Indian from trading with Indians in the Indian country without a license. Section 7 of this act provided:

"That if any person other than an Indian shall, within the Indian country, purchase or receive of any Indian, in the way of barter, trade, or pledge, a gun, trap, or other article commonly used in hunting, any instrument of husbandry or cooking utensils of the kind commonly obtained by the Indians in their intercourse with the white people, or any other article of clothing, except skins or furs, he shall forfeit and pay the sum of fifty dollars."

Thus Congress again made clear its purpose to protect the Indians from improvidence in selling their necessaries, and forbade their purchase by any one except Indians. This provision was incorporated in the Revised Statutes as section 2135.

The second act on the same day on this subject was entitled "An act to provide for the organization of the Department of Indian Affairs." Act June 30, 1834, c. 162, 4 Stat. 735. It provided for the appointment of superintendents of Indian affairs, Indian agents, subagents, interpreters, blacksmiths, assistant blacksmiths, farmers, mechanics, and teachers. It provided that in the employment of interpreters and other persons employed for the benefit of the Indians preference should be given to persons of Indian descent, if such could be found properly qualified for the execution of the duties. Section 14 of the act read:

"And be it further enacted, that no person employed in the Indian department shall have any interest or concern in any trade with the Indians, except for, and on account of, the United States; and any person offending herein, shall forfeit the sum of five thousand dollars, and upon satisfactory information of such offense being laid before the President of the United States, it shall become his duty to remove such person from the office or situation he may hold."

This section, with some modifications, became section 2078 of the. Revised Statutes. The Indian appropriation law passed July 4, 1884, contained the following provision:

"That where Indians are in possession or control of cattle or their increase which have been purchased by the government such cattle shall not be sold to any person not a member of the tribe to which the owners of the cattle belong or to any citizen of the United States whether intermarried with the Indians or not except with the consent in writing of the agent of the tribe to which the owner or possessor of the cattle belongs."

It is contended that this is the only direct expression the law makes concerning cattle of the character involved in this case, and that it is valuable in considering the meaning of the expression "any trade with the Indians." It is further contended that all persons except Indians are prohibited from trading with the Indians without a license, and if the purchase of cattle from any Indian or Indians of itself constitutes trade with the Indians the act of 1884 was superfluous as a prohibition. An analysis of this statute shows there is little of force in this contention. While it may be said that the exception with reference to purchases by members of the tribe implies that Indians may purchase "I. D." cattle from members of the same tribe, Indians of other tribes and citizens of the United States, whether intermarried with Indians or not, and whether in general licensed to trade with Indians or not, were prohibited from buying these cattle except with the consent in writing of the Indian agent. Defendant did not procure the consent of the Indian agent as provided by the statute; but if she was a member of the same tribe with the Indians of whom she purchased it is claimed that she had a right to make the purchases. As an Indian of the same tribe she could probably have lawfully made these purchases, were it not for the fact that by reason of her also being a government employé in Indian affairs she was prohibited from doing so. There was nothing in this act to indicate a purpose on the part of Congress to authorize the government's own agents, placed in a controlling position to use that position, to overreach its wards. All the statutes relied upon as bearing on the construction of the word "trade," and many others, have been carefully considered; but none of them have any tendency to show that the word "trade" was used in the act in question in any other than its usual and ordinary sense.

The government in its capacity as quasi guardian ought not to allow its agents to be tempted to overreach its wards. A schoolmaster placed by the government among a people under tutelage might well be expected to wield a large influence, and it is revolting that this influence should be used to subserve self-interest in barter with those who are the subject of wardship. We sustain a trust relation with the Indians imposed by the laws of the land, if not by an even higher law; and

when Congress, recognizing this, forbade its agents to trade with the Indians, no strained effort should be made to construe trade in some unusual way, so as to include only sales to the Indians, and not purchases from them, when it is a matter of common knowledge that there would be more danger of the Indians improvidently parting with their property than of their improvidently acquiring new property.

The judgment is reversed and remanded, with directions to the District Court to render judgment for the government as prayed.