**BLUEJACKET et al. v. EWERT.**

(Circuit Court of Appeals, Eighth Circuit. March 1, 1920. Rehearing Denied August 7, 1920.)

No. 5316.

1. **Indians ⬤15(1)—Sale of land of minor heirs need not be confirmed.**

Under Act May 27, 1902, § 7 (Comp. St. § 4223), providing that the interests of minor heirs of a deceased Indian owning land subject to restrictions on alienation shall be sold only by a guardian duly appointed by the proper court on order of the court, subject to the approval of the Secretary of the Interior, confirmation by the county court appointing a guardian of his report of sale under regulations prescribed by the Secretary was not required, as the statute makes no such requirement, and Congress had plenary authority in fixing the conditions of such sales.

2. **Indians ⬤33—Special assistant attorney in suits involving Indian lands disqualified to trade with Indians; "employed in Indian affairs."**

An attorney appointed by the Attorney General as a special assistant to assist in the institution and prosecution of suits to set aside deeds to Indian allotments was "employed in Indian affairs," within Rev. St. § 2078 (Comp. St. § 4026), providing that no person so employed shall have any interest or concern in trade with the Indians, as the department from which the appointment came was not controlling.

3. **Indians ⬤15(1)—Sale of land by Indian agent to special assistant to Attorney General prohibited; "trade with Indians."**

A purchase of land of heirs of a deceased Indian by a special assistant to the Attorney General constituted "trade with the Indians," within the prohibition of Rev. St. § 2078 (Comp. St. § 4026), though the sale was

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

made by the Indian agent under regulations of the Secretary of the Interior, and the purchaser never saw or communicated with any of the Indians, and they were not conscious that he was employed in Indian affairs.

**4. Evidence ⬉83(3)—Rules governing sales of Indian's lands presumed followed.**

The presumption is that the rules established by the Secretary of the Interior governing sales of inherited Indian lands were followed by the officers in charge of that sale.

**5. Indians ⬉27(6)—Adult heirs, suing to set aside conveyance, must negative laches.**

Adult heirs of a deceased Indian, suing to set aside a conveyance after the time for such a suit under the state statutes of limitation has expired, must plead and prove facts and circumstances showing that they were not guilty of laches.

**6. Indians ⬉27(4)—Adult heirs must use diligence in seeking to set aside conveyance.**

Under Act May 27, 1902, § 7 (Comp. St. § 4223), adult heirs of a deceased Indian are free to convey the land, and are chargeable with the same diligence as white people in discovering and pursuing their legal remedies, seeking the setting aside of the conveyance.

**7. Indians ⬉27(4)—Suit by minor heirs to set aside guardian's conveyance not barred by laches.**

Under Rev. Laws Okl. 1910, § 885, authorizing minors to disaffirm contracts before majority or within one year thereafter, a suit by an Indian's minor heirs to set aside their guardian's conveyance of land was not barred by laches when brought before their majority.

**8. Indians ⬉27(6)—Defendant required to show laches in suit to set aside conveyance.**

Where, in a suit to set aside a guardian's conveyance of the interests of minor heirs of a deceased Indian, laches did not appear on the face of the bill or in plaintiff's proofs, it was incumbent on defendant to show the existence of laches.

**9. Infants ⬉31(2)—Consideration need not be restored, to obtain cancellation of deed, if disposed of.**

The rule that it is ordinarily necessary for one seeking the cancellation of a deed to do equity by restoring the consideration received does not apply to the disaffirmance of a deed of an infant, if prior to the disaffirmance and during infancy the consideration received has been disposed of, wasted, or consumed, and cannot be returned.

**10. Evidence ⬉83(3)—Price of Indian lands presumed deposited as required by rules.**

The presumption is that the purchase money on a sale of the interests of minor heirs of a deceased Indian was deposited in banks or with the Indian agent as required by the rules of the Secretary of the Interior.

**11. Indians ⬉27(3)—Minor heirs, suing to set aside conveyance, need not restore consideration not received by them.**

In a suit by minor heirs of a deceased Indian to set aside a conveyance, they are under no obligation to restore the consideration, where it is not shown that the money has been withdrawn from the custody of the bank or the Indian agent, with whom it was presumptively deposited, or ever came into their possession.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit by Carrie Bluejacket and others against Paul A. Ewert. Decree for defendant, and plaintiffs appeal. Reversed and remanded in part, and affirmed in part.

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The appellants (hereinafter called plaintiffs) brought suit to cancel a conveyance of land in Ottawa, Okl., made by them to appellee (hereinafter called defendant). From a decree dismissing the bill this appeal is prosecuted. The land had been allotted to Charles Bluejacket, an Indian of the Quapaw tribe, under the provisions of the Act of Congress of March 2, 1895 (28 Stat. 876, 907), and a patent had been issued to him, containing a restriction upon alienation within 25 years from its date. Charles Bluejacket died intestate in 1907, leaving as his heirs the plaintiffs, and others, who are not parties to this suit. The conveyance to defendant by the widow, the adult heirs, and the guardians of the minor heirs of Charles Bluejacket was executed on April 8, 1909, under the authority of that portion of section 7 of the Act of Congress of May 27, 1902 (32 Stat. 245, 275 [Comp. St. § 4223]), which reads as follows:

"That the adult heirs of any deceased Indian to whom a trust or other patent containing restrictions upon alienation has been or shall be issued for lands allotted to him may sell and convey the lands inherited from such decedent, but in case of minor heirs their interests shall be sold only by a guardian duly appointed by the proper court upon the order of such court, made upon petition filed by the guardian, but all such conveyances shall be subject to the approval of the Secretary of the Interior, and when so approved shall convey a full title to the purchaser, the same as if a final patent without restriction upon the alienation had been issued to the allottee."

The bill alleges as the grounds for setting aside the conveyance that the grantee was disqualified and prohibited by law from receiving the conveyance and that no report of the guardians' deed and sale was approved by the county court which had appointed them.

Before the proceedings were taken for the sale of plaintiffs' lands, the Secretary of the Interior had adopted a set of rules and regulations applying to proposed sales of inherited Indian lands under the provisions of the statute last quoted, and compliance with them was a condition upon which his approval of any conveyance depended. These rules required that a minor heir's interest could only be conveyed by a guardian duly appointed by the proper court, and upon the order of such court, made upon a petition filed by the guardian, but all such conveyances were subject to the approval of the Secretary of the Interior. The owners of inherited Indian land who desired to sell it were also required to petition the Indian agent having charge of the territory wherein the land was situated asking to have the land sold in accordance with the rules of the Secretary, and agreeing that the proceeds of the sale should be placed in designated banks, and its withdrawal was subject to the approval of officers of the Indian department. The Indian agent, if satisfied that the facts alleged in the petition were sufficient, would file the petition and send a copy to the Commissioner of Indian Affairs. The agent was required to post in a conspicuous place in his office for the period of 60 days, a list of the lands, the names of the owners, and the dates when bids would be opened. When any land had been posted for sale, it was the Indian agent's duty to view and appraise it, make a certificate of the appraisement, seal it, and not to open it until the date of sale. The appraisement was not to be made public either before or after the sale and no bid for less than the appraisal value was to be considered. No Indian agent nor any one connected with the agency office could prepare or assist in preparing the bid of any prospective purchaser. The bids were received in sealed envelopes, with the date marked thereon when they were to be opened. The right to reject any and all bids was reserved and the acceptance of all bids was subject to the approval of the owner of the land. Lands not disposed of at the appointed time could, if the owner so desired, be relisted and offered for sale after after 30 days' advertisement, under the same rules that governed their original listing. The Commissioner of Indian Affairs was required to advertise in some local paper of general circulation near the lands the proposed sale of lands and inviting bids therefor, and a list of the lands offered for sale was also to be published in the weekly edition of the newspaper of widest circulation in the county where the lands were situated.

The deed of conveyance was required to be submitted for the Secretary's approval, accompanied by the original petition, the appraisement, all bids,

checks received to apply on payment, a report by the agent of all proceedings prior to the execution of the deed, together with a certificate from the agent that the deed was fully explained to the grantors, that the consideration was the fair price for the land, and that the conveyance was free from fraud and deception. The purchase price in no case was to be paid to the grantors, but deposited in a bank, or paid to the Indian agent, for the benefit of the grantors, when the Secretary should have approved the deed. Affidavits of grantors and grantees were required with the deed, showing that there was no contract, agreement or understanding, oral or written, for the refunding of any of the consideration money to the purchaser, or for the exchange of any property in lieu of the consideration money. The grantee's affidavit was also required to the effect that he was not a party to any association of persons to acquire such lands at less than their fair value, or to prevent open and fair competition in the purchase; that the contract was not procured by false representations to the grantor, or suppression of facts as to the value of the land or any other feature of the transaction; and that neither the grantor nor any person for him had been given or promised any money or thing of value, except the consideration, to induce him to agree to the sale of his land. The form of deed was also prescribed by the rules.

The plaintiff in June, 1908, filed a petition with the Indian agent for the Quapaw Tribe praying for the sale of these lands and agreeing to be bound by these rules governing the sale of such lands. The lands were listed for sale and the time for opening bids fixed for August 17, 1908. An appraisal was also made. This appraisal was kept secret until after the execution of the deed, its approval by the Secretary of the Interior and its delivery to defendant.

Early in July, 1908, petitions were filed with the county court of Ottawa county by the guardians of those of the plaintiffs who were then minors, praying for authority to make sale of the wards' shares in the lands and to join with the other heirs in such sale. The adult heirs waived notice of the hearing upon these petitions and on July 17 orders were entered by the county judge authorizing the guardians to sell the minors' shares according to the rules prescribed by the Secretary of the Interior, and directing a report of the guardians' proceedings under the order. It seems to be conceded by counsel that the proceedings leading up to the deed were substantially as now recited. At the first date fixed for opening bids, one Hughes presented a bid for the lands of $4,000, which was rejected as below the appraised value. The lands were offered a second time, but at the time fixed for receiving bids, September 1, none had been received. The lands were offered a third time, but at the time fixed, October 26, no bids were received. The lands were again offered for the fourth time on November 27, but no bids were received. Bids were invited for the fifth time, and on December 21, the defendant filed a bid of $4,000, which was rejected as below the appraised valuation. At the sixth offering of the lands, on January 25, 1909, the defendant filed a bid of $4,680, which was again rejected as below the appraised valuation. At a seventh offering of the lands on February 22, 1909, the defendant bid $4,000 for a portion of the lands, but this bid was rejected. The lands were again offered for the eighth time on March 29, 1909, and the defendant's bid of $5,000 was accepted. The deed to the defendant was then executed in April, 1909. It was approved by the Secretary of the Interior on July 26, 1909, delivered to defendant and recorded, and defendant took possession some time afterward.

Hiram W. Currey, of Joplin, Mo. (A. Scott Thompson, of Miami, Okl., on the brief), for appellants.

Paul A. Ewert, of Joplin, Mo., pro se.

Before SANBORN and STONE, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge (after stating the facts as above). [1] Complaint is made because the court refused to permit the plain-

tiff to file an amended bill, and to set aside the submission of the case and allow further testimony on behalf of the plaintiff. The application was made 11 weeks after the case had been heard upon the pleadings and the testimony. The showing in support of the application is of great length, but a recital of its merits would not be profitable. There was no error in refusing the application. It is also urged that a confirmation by the county court of the report of the guardians' sale was essential to convey the title of the wards. Neither the statute authorizing the sale of such lands nor the rules of the Secretary of the Interior make such a requirement, and the authority of Congress was plenary in fixing the conditions upon which sales of these Indian lands would be permitted.

The claim that defendant was disqualified from purchasing the land is founded upon the provisions of section 2078 of the Revised Statutes (Comp. St. § 4026), as follows:

. "No person employed in Indian affairs shall have any interest or concern in any trade with the Indians, except for, and on account of, the United States; and any person offending herein, shall be liable to a penalty of five thousand dollars, and shall be removed from his office."

[2] All the facts shown in evidence in relation to Mr. Ewert, the defendant, that are claimed to bring his purchase within the condemnation of this statute may be shortly stated. Mr. Ewert was an attorney at law formerly residing in Minnesota. On October 23, 1908, the Attorney General of the United States appointed him as a special assistant to the Attorney General to assist in the institution and prosecution of suits to set aside deeds made to certain allotments in the Quapaw Indian agency. His official residence was fixed at Miami, Okl. He removed to Oklahoma, going first to Muskogee and remaining there the greater part of November. About the 1st of December he moved to Miami and appears to have continued to reside there for some months thereafter. These facts sufficiently show that he was employed in Indian affairs. Although he was an appointee of the Department of Justice, his business was only in connection with Indian lands and litigation concerning them. The statute does not regard the department from whence comes the appointment but the department in connection with which the services are rendered. Do the facts show that the defendant had an interest in any trade with the Indians? In United States v. Douglas, 190 Fed. 482, 111 C. C. A. 314, 36 L. R. A. (N. S.) 1075, this court reviewed the history of the legislation relating to the statute in question and outlined the general meaning of the word "trade" as used in the statute. It was there said:

"The statute in question, being penal in nature, should, of course, be strictly construed. There is little if any conflict as to the usual and ordinary meaning of the word 'trade.' It is defined in Webster's International Dictionary as: 'The act or business of exchanging commodities by barter or by buying and selling for money; commerce; traffic; barter.'

"The Century Dictionary defines it as: 'The exchange of commodities for other commodities or for money. The business of buying or selling, dealing by way of exchange, commerce, traffic. Trade comprehends every species of exchange or dealing either in the produce of land, in manufactures, or in bills or money.'

"In the New American Encyclopædic Dictionary it is defined as: 'The act, occupation or business· of exchanging commodities for other commodities or for money. The business of buying and selling; dealing by way of sale or exchange; commerce; traffic.'

"In Bouvier's Law Dictionary it is said: 'In its most extensive signification, the word includes all sorts of dealings by way of sale or exchange.'

"In Rapalje and Lawrence's Law Dictionary it is defined as: 'Traffic; commerce; exchange of goods for other goods or for money.'

"In 28 American and English Encyclopædia of ·Law (2d Ed.) 338, it is said: 'In ordinary language the word "trade" is employed in three different senses: First, in that of the business of buying and selling; second, in that of an occupation generally; and, third, in that of a mechanical employment in contradistinction to agriculture and the liberal arts.'

"In May v. Sloan (May v. Rice), 101 U. S. 237, 25 L. Ed. 797, it is said: 'The word "trade," in its broadest signification, includes not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally.'

"In Queen Ins. Co. v. State, 86 Tex. 250, 22 L. R. A. 483, 24 S. W. 397, and in Texas & Pacific Coal Co. ·v. Lawson, 89 Tex. 401, 34 S. W. 920, it is said: 'The word "trade" means traffic, which is·defined to be the passing of goods and commodities from one person to another for an equivalent in goods or money.'

"It has further been judicially defined as: 'The exchange of commodities for other commodities or for money; the business of buying and selling; dealing by way of sale or exchange.' In re Grand Jury (D. C.) 62 Fed. 840; United States v. Cassidy (D. C.) 67 Fed. 705; United States v. Coal Dealers' Ass'n (C. C.) 85 Fed. 265.

"Similar citations could be almost indefinitely multiplied. It is manifest that, if the word 'trade' was employed in the statute in question in its ordinary use and acceptation, the defendant had both interest and concern in trade with the Indians on her own account, and not on account of the United States."

[3, 4] The statute was held to apply to the purchase by an industrial teacher at the Indian agency of cattle from the Indians on the reservation, because such a person might be expected to wield a large influence, and such an influence should not be used to subserve self interest in barter with the Indians. The facts in the present case do not disclose the direct exertion of any influence over the Indians. It is not shown that the defendant ever saw or communicated with any of the plaintiffs or that the Indians were conscious that defendant was employed in Indian affairs. The presumption is that the rules established by the Secretary of the Interior governing sales of inherited Indian lands were followed by the officials in charge of that sale; that defendant's bid for these lands was delivered to the Indian agent and by him transmitted to the Secretary, together with all the proceedings and the report of the agent, and with a showing that there was no agreement or understanding between defendant and plaintiffs. So far as appears the defendant was but a passive recipient of a conveyance from the Indians. Exercising its undoubted authority, the government offered the property for sale, advertised it, made the appraisal, received the bids, decided upon approval of its acceptance by the Indians, approved the deed, and controlled. the receipt and disposition of the purchase price.

The defendant therefore ·claims that he was not engaged in any trade with the Indians, but that his dealing was with the United States. This view ignores the fact that·the plaintiffs in deciding whether to

refuse or accept defendant's bid, and in executing the deed to defendant as grantee may have signed it because of confidence in his official position and his relation to the Indians. One purpose of the statute is to prevent the possible play of official influence over the mind of the Indian in his consideration of any proposed trade with him. Another purpose is to preserve loyalty, or at least disinterestedness toward the Indian's interests by those employed in Indian affairs. If it were held that the statute did not apply to a trade between an official of the Indian department and the Indians except where the Indian was conscious that he was dealing with such an employé the way would be open for employés and officers of the Indian department to take advantage of their knowledge of the Indians' affairs and of their needs, to make purchases or sales for their own benefit through third persons, agents and corporations. Similarly, officers and employés of the Indian department at Washington or at any agency could trade with Indians living at a distance if they were not acquainted with their official positions. The statute is not confined in terms to trade with the Indians, when the Indian is conscious of the position of the official, nor when an effect upon the trade by the use of his official position is demonstrated, and such a construction would be contrary to the practical interpretation that has been placed upon the statute by the Indian department ever since its enactment. The conclusion is that the statute applied to the taking of the deed by the defendant.

[5, 6] The plaintiff executed this deed in April, 1909, and this suit to cancel the deed was begun in June, 1916. The time within which the adult grantors could have brought such a suit under the statutes of limitation applicable to suits or cases by the laws of Oklahoma had then expired. The complainants of that class were therefore obligated to plead and prove the facts and circumstances showing that they were not guilty of laches, in order to maintain the suit after the lapse of time fixed by the analogous statute of limitations. Kelley v. Boettcher, 85 Fed. 55, 29 C. C. A. 14; Redd v. Brun, 157 Fed. 190, 84 C. C. A. 638, and cases cited. The bill contains no allegations and the proofs afford no facts to take the case out of the ordinary rule and to make it equitable to allow its maintenance at this time, unless it be the fact that the plaintiffs were Indians. The adult plaintiffs were free to make conveyance of this land, even though they were Indians, and their tribal relations had been severed, and they were chargeable with the same diligence as white people in discovering and pursuing their legal remedies. Felix v. Patrick, 145 U. S. 317, 331, 332, 12 Sup. Ct. 862, 36 L. Ed. 719; Schrimpscher v. Stockton, 183 U. S. 290, 296, 22 Sup. Ct. 107, 46 L. Ed. 203. The deed to defendant was made by Carrie Bluejacket as guardian of four of the minor heirs—William, Blanche, Amy and Clyde Bluejacket. Among the plaintiffs in this bill are Amy Bluejacket and Clyde Bluejacket, as minors, suing by their next friend, and Blanche Bear, formerly Blanche Bluejacket, who is not alleged or shown to be a minor, and Carrie Bluejacket who sues as the heir of William Bluejacket, deceased, but the date of his death is not shown. Whether guardianship of any of these minors has been terminated is not shown. By section 6583 of the Revised Laws of Oklahoma (1910) it is provided:

"No action for the recovery of any estate, sold by a guardian, can be maintained by the ward, or by any person claiming under him, unless it is commenced within three years next after the termination of the guardianship, or when a legal disability to sue exists by reason of minority or otherwise, at the time when the cause of action accrues, within three years next after the removal thereof."

[7] The suit of Amy and Clyde Bluejacket obviously is not barred by laches. Their rights to maintain a suit to disaffirm their deed before they have attained their majority is conferred by the Oklahoma statutes. Rev. Laws Okl. (1910) § 885; Ryan v. Morrison, 40 Okl. 49, 135 Pac. 1049.

[8-11] The suit of Blanche Bear and of Carrie Bluejacket, as heirs of William Bluejacket, is not shown by the bill nor by the proofs to have been begun too late to obtain the relief demanded. It was incumbent upon the defendant to show that laches existed sufficient to bar their suit, if such fact did not appear from the face of the bill or in their proofs. In order to obtain a cancellation of a deed it is ordinarily necessary that plaintiffs do equity by restoring the consideration received therefor, but this rule does not apply to the disaffirmance of the deed of an infant, if prior to the disaffirmance and during infancy the consideration received has been disposed of, wasted or consumed and cannot be returned. It is not necessary to place the grantee in statu quo. MacGreal v. Taylor, 167 U. S. 688, 698, 17 Sup. Ct. 961, 42 L. Ed. 326; Alfrey v. Colbert, 168 Fed. 231, 235, 93 C. C. A. 517. If there is no evidence that the infant has received the consideration he is not required to offer to return it. Blakemore v. Johnson, 24 Okl. 544, 103 Pac. 554; Monumental Ass'n v. Herman, 33 Md. 133; Thormaehlen v. Kaeppel, 86 Wis. 378, 56 N. W. 1089; Stull v. Harris, 51 Ark. 294, 11 S. W. 104, 2 L. R. A. 741; Richardson v. Pate, 93 Ind. 423, 47 Am. Rep. 374; Clark v. Tate, 7 Mont. 171, 14 Pac. 761; Bradshaw v. Van Valkenburg, 97 Tenn. 316, 37 S. W. 88. The presumption is that the purchase money was deposited in banks or with the Indian agent, as required by the rules. There is no evidence that shows the money to have been withdrawn either by the guardian of the minors or by the minors, or that any of it ever came into their possession. An obligation to restore to defendant the consideration for the conveyance of these lands therefore does not appear.

It appears that the defendant has mortgaged the land to secure an indebtedness of his. The mortgagee is not a party to the suit. Plaintiffs ask for a judgment against defendant equal to the amount of this incumbrance, and they also ask for an accounting for the rents and profits of the land since the date of the conveyance. We think the decree should be reversed and the case remanded with directions to grant the prayers of Amy and Clyde Bluejacket, of Blanche Bear and of Carrie Bluejacket as heirs of William Bluejacket for a cancellation of the deed from these four minor heirs to the defendant, and for an accounting and for indemnification against the apparent lien of the mortgage on their shares of the lands. The decree as to the other plaintiffs will be affirmed, and no costs be adjudged against any of the parties.